[J-57-2023] [MO: Todd, C.J.]

# IN THE SUPREME COURT OF PENNSYLVANIA
## MIDDLE DISTRICT

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 102 MAP 2022 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court dated April 5, 2022 |
| | : | at No. 446 MDA 2021 Affirming the |
| v. | : | Judgment of Sentence of the |
| | : | Wyoming County Court of Common |
| | : | Pleas, Criminal Division, dated |
| PHILLIP DONALD WALTERS, | : | December 10, 2020 at No. CP-66- |
| | : | CR-0000058-2019. |
| Appellant | : | |
| | : | ARGUED:  October 18, 2023 |

## CONCURRING OPINION

**JUSTICE WECHT** **DECIDED:  September 23, 2024**

I join the Majority's opinion in full.  I write separately to explain why a forensic pathologist's determination as to the cause of a person's death can never be admissible at a murder trial when that determination is based exclusively upon another person's statements.

The typical murder case involves a number of different professionals, each of whom performs distinct, but essential, functions.  For example, the first police officer to respond ensures that the danger has dissipated, and that officer then secures the scene.  Other officers search for physical evidence and canvass the neighborhood for witnesses.  Crime scene technicians photograph the site and recover both physical and biological evidence.  Scientific experts test firearms for size and functionality, examine clothing for blood and semen stains, and compare DNA profiles extracted from biological material left at the scene.  Detectives interview witnesses, ascertain a motive, develop a suspect, and

make an arrest.  A prosecutor compiles all of this information and presents it to a jury (or judge) at trial.

There is (at least) one additional person who is essential.  Someone must determine how, when, and why the victim died.  After all, there is no murder case if the decedent died by suicide, or by accident, or from natural causes.  These determinations form part of the forensic pathologist's role.  In many murder cases, this pathologist will perform an autopsy, review the scene (or photographs of the scene) and all of the other available evidence, apply his or her medical knowledge, training, and experience to render an opinion as to the cause and manner of death, and then present that opinion at trial (assuming the manner of death is homicide).  The appeal we decide today addresses the way in which a forensic pathologist reaches that opinion.  More specifically, this case asks whether a forensic pathologist's opinion is admissible under the law and our rules of evidence when that opinion is based exclusively upon the "history" of a case (which in this case consisted solely of statements of a Commonwealth witness) rather than upon that pathologist's independent medical judgment and expertise.

As the Majority recounts, the victim's body was recovered after having been submerged in a river for an extended period of time.  Her body was in a "very advanced state of decomposition," so much so that the head and neck—the most critical parts of the body here in light of the Commonwealth's theory that she was strangled to death— were almost entirely "skeletonized."[1]  The Commonwealth's forensic pathologist, Gary Ross, M.D., performed an autopsy on the victim.  Because of the decomposed condition of the body, Dr. Ross was incapable of making any relevant pathological observations or findings to a reasonable degree of medical certainty.  Dr. Ross's examination revealed

---

[1]     Notes of Testimony ("N.T."), 10/26/2020, at 18.

"no physical actual evidence that a strangulation had occurred."[2] Dr. Ross could rule out some causes of death, but, due to the extensive decomposition, he could not rule out many others. Finding no anatomical evidence of strangulation, Dr. Ross initially concluded that the cause of the victim's death was "undetermined."[3]

But, after he was supplied a "history" of the case, Dr. Ross changed his mind. That "history" was a statement by the Commonwealth's central witness, Gabel Bell, and nothing more. Bell claimed that Walters had admitted to strangling the victim. Despite finding no anatomical indicia of strangulation, and having made no independent medical observations or deductions supporting strangulation, Dr. Ross adopted Bell's version of events. He then changed his opinion as to cause of death from undetermined to what he creatively labeled "strangulation by history."

The Majority correctly holds that: (1) an opinion as to cause or manner of death based entirely upon "history" is inadmissible under our caselaw and our rules of evidence; (2) Dr. Ross' testimony impermissibly bolstered Gabel Bell's credibility; and (3) the error in allowing the testimony was not harmless.[4]

Forensic pathology is a "unique discipline within medicine that bridges the world of science and law."[5] A forensic pathologist is a medical doctor "who has undergone at least three years of anatomic pathology residency and one year of subspeciality training in forensic pathology."[6] Many forensic pathologists also undergo additional training in "clinical pathology, neuropathology, cardiac pathology, and pediatric pathology," as well

---

[2]    *Id.* at 32.

[3]    *Id.*

[4]    *See* Maj. Op. at 19, 23, and 24.

[5]    Kanayo Tatsumi, M.D., & Michael Graham, M.D., *Death Investigation in the United States: Forensic Pathology*, Missouri Medicine, September/October 2022, 119:5, at 411.

[6]    *Id.*

as in non-medical fields, such as "toxicology, firearms, trace evidence, and anthropology."[7]  By virtue of this extensive and diversified education, the forensic pathologist is uniquely equipped to ascertain the "cause, mechanism, and manner of death."[8]

This is no easy task, as no two deaths, particularly suspicious ones, are the same. Each involves a unique set of circumstances, environment, and background.  Unlike a treating physician, a forensic pathologist does not have a living patient who can describe a "history of present illness."[9]  The pathologist must instead gather pieces of information from a variety of sources and attempt to arrange those pieces into an accurate, reliable picture of what caused the person's death.  While the most important piece of the puzzle is the body, a forensic pathologist also is guided by information gleaned from the police investigation, including "accounts given by family/friends and witnesses, law enforcement evaluation, and, most importantly, inspection of the scene."[10]  This investigation does not culminate until the forensic pathologist analyzes results of the "autopsy, histology, toxicology, and other ancillary studies."[11]  Critically, no one source of information "is interpreted in a vacuum."[12]  Each piece of evidence must be considered "in the context of all available pertinent information."[13]

---

[7]      *Id.*

[8]      *Id.*

[9]      *Id.* at 413.

[10]     *Id.*

[11]     *Id.*

[12]     *Id.* at 415.

[13]     *Id.*

The task becomes even more difficult in cases where the investigation does not yield all of the information that a forensic pathologist might need (or want). The scene of the crime might be awash with blood stains, but there might not be any witness statements. A toxicology report might contain no relevant evidence, but the body might demonstrate signs of blunt force trauma. There may be stippling around what appears to be a gunshot wound, but no firearms or shell casings are found in the surrounding area. The forensic pathologist must consider all available information in formulating an opinion. This necessarily includes the "history" of a case. Such information often is relevant, helpful, and, in some cases, essential in determining the cause and manner of a person's death. Thus, the Dissent is correct to suggest that the assessment of a case's "history" is a commonly accepted and approved methodology in the field of forensic pathology.[14] The problem is that the Dissent maintains that this uncontroversial proposition suffices to resolve this case. It does not. No one would argue that forensic pathologists can never consider the "history" of a particular case. They should, and they do. But, that is not what today's case is about. This appeal asks whether a forensic pathologist can rely *only* on that "history" and use that as the sole basis to offer an admissible opinion on the cause

---

[14]     *See* Diss. Op. at 5 (Mundy, J., dissenting).

or manner of person's death.[15] The Dissent never addresses, let alone resolves, this question.[16]

The answer to the question is straightforward. When a forensic pathologist offers a cause or manner of death that is predicated entirely upon "history"—that is, information that the forensic pathologist cannot corroborate with any independent medical findings or evidence—that forensic pathologist is not offering an admissible opinion at all. The forensic pathologist is not using that "history" as a component in rendering a medical opinion. Nor is that forensic pathologist utilizing the "history" to explain medical observations, to support scientific deductions, or to facilitate an understanding of the evidence. That forensic pathologist is merely repeating what someone else said. That is

___

[15] The Dissent mistakes Walters' challenge to the admissibility of Dr. Ross' opinion as a *Frye* challenge. *See* Diss. Op. at 1-4. A proper *Frye* challenge contests whether the methodology that generated the proffered "novel scientific evidence" has gained "general acceptance in the relevant scientific community." *Grady v. Frito-Lay, Inc.*, 839 A.2d 1038, 1043-44 (Pa. 2003) (citing *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923); *Commonwealth v. Blasioli*, 713 A.2d 1117, 1119 (Pa. 1998) (footnote omitted)). We all agree that consideration of the "history" of a case is a generally accepted tool used in formulating an opinion as to cause of death. Resolution of this case is in no way dependent upon whether the use of "history" has achieved "general acceptance in the [forensic pathology] community." *Id.* There was no need to request, let alone to hold, a *Frye* hearing. The reason that Dr. Ross' opinion is inadmissible is that he made no independent medical conclusions of his own, not because the way he reached that conclusion failed the *Frye* test. His testimony failed to satisfy the most basic elements of what constitutes expert testimony under Pa.R.E. 702 and 703. Because the Dissent misapprehends this premise, it would find waiver. There is no waiver here.

[16] The Dissent commits another error. The Dissent faults Walters for failing to "introduce any evidence suggesting that the methodology utilized by Dr. Ross in reaching his opinion is not generally accepted within the medical community." *Id.* at 5. It is the proponent, not the opponent, of expert testimony that must demonstrate its admissibility under the law. *See Walsh v. BASF Corp.*, 234 A.3d 446, 456 (Pa. 2020) ("The proponent of the admission of expert scientific evidence bears the burden of establishing all of the elements supporting its admission, including the general acceptance of the methodology employed in the relevant scientific community."). In other words, the burden lies with the Commonwealth to prove that its expert's methods are accepted in the relevant field. As the Dissent would have it, an expert's testimony would be automatically admissible unless and until the opposing party could prove otherwise. That get things backwards.

not a professional opinion. An opinion is a "formal expression of judgment or advice based on an expert's special knowledge."[17] No special knowledge or expertise is required for anyone to take the witness stand and simply repeat what someone else said. Cloaking such repetition in the guise of expert testimony and stamping it with the imprimatur of an expert with unassailable credentials does not transform someone else's account into an admissible opinion.

Consider what occurred in this case. Due to the state of the victim's body, Dr. Ross was unable to reach any medical conclusions about how she died. He could not exclude all possible causes of death. Naturally, having no useful evidence or information, Dr. Ross concluded that the cause of the victim's death had to be listed as "undetermined." However, Dr. Ross changed that determination (or lack of a determination) when he was told that Gabel Bell had claimed that Walters had said he strangled the victim. Supplied with this statement, Dr. Ross changed his finding, and now opined that the cause of death was "strangulation by history." There was no anatomical, physical, or forensic evidence to corroborate this new determination. Dr. Ross did not render an independent medical judgment, because he could not do so. He simply took Gabel Bell's word for it, and then repeated *her* words to the jury.

If this is an admissible expert opinion, then anyone can be an expert. Anyone can take the witness stand and repeat what someone else told them. A teacher, an engineer, a park ranger, or some random passerby all could have testified that the victim was strangled here simply because Gabel Bell told them so. A forensic pathologist was not needed to do this. No one offered an actual opinion as to how the victim died. Dr. Ross simply repeated what another person reported that Walters had said about how the victim

---

[17]     *Opinion*, BLACK'S LAW DICTIONARY (12th ed. 2024).

died.[18] A person does not need any particular "knowledge, skill, experience, training, or education" [19] to repeat what he's been told. In fact, while Rule 703 of the Pennsylvania Rules of evidence allows an expert to base an opinion upon information "that the expert has been made aware of,"[20] the comment to that rule specifically prohibits experts from serving as a "mere conduit for the opinion of another."[21] Nor does repeating what another said require any "scientific, technical, or other specialized knowledge."[22] The jury heard from Gabel Bell at trial. The jury did not need an expert with special training or skill to repeat Bell's claim in order to understand that claim.[23]

There is an important difference between using "history" as a factor in ascertaining the cause of a person's death and using it as the *only* factor. Consider the following hypothetical. Suppose a man goes to see his family physician after experiencing back pain for a relatively short period of time. When the physician enters the examination room, the patient promptly informs her that his mother told him that he has spinal cancer, which runs in the family. Without any independent evidence, the physician immediately takes the patient into surgery. This physician did not reach a medical opinion, at least not

---

[18] Although there is no hearsay issue presented to us in this appeal, it is difficult to ignore the fact that Dr. Ross's opinion was based upon Gabel Bell's report of what Walters had told her, which is a classic example of typically inadmissible double hearsay. *See Commonwealth v. Laich*, 777 A.2d 1057, 1060 (Pa. 2001) (explaining that double hearsay is an "out-of-court declaration containing another out-of-court declaration," and that, in order for the entire statement to be admissible, both hearsay statements must be individually admissible) (citations omitted).

[19] *See* Pa.R.E. 702.

[20] Pa.R.E. 703.

[21] *Id.* cmt.

[22] *Id.* at 702(a).

[23] *Id.* at 702(c) (permitting expert testimony when it will "help the trier of fact to understand the evidence or to determine a fact in issue").

one using a methodology that the medical community would recognize as reasonable. Now, to appreciate the difference, consider an emergency room physician who observes a penetrating laceration on a patient's abdomen that is two inches long and four inches deep. The police officer that accompanied the patient to the hospital tells the treating physician that the injury was caused by a bloody knife with a very sharp, five inch blade that was found near the patient's body. The physician concludes that the patient was stabbed, which likely caused internal injuries, and the physician immediately begins surgery. This physician, unlike the first one, considered the police statement in conjunction with her independent medical observations, training, and expertise, and then formed a professionally reasonable opinion.

An expert who applies none of his or her expertise, but who instead relies exclusively upon someone else's words or observations, is no more a witness offering an admissible opinion than he would be an author by writing his name on the cover of someone else's book, or a chef by serving food that someone else cooked. For this reason, as the Majority correctly concludes, no conclusion reached in this manner can be offered to a reasonable degree of medical certainty, as our law requires. And it never can be. "History" is a relevant and important part of a forensic pathologist's formulation of an opinion on the cause and manner of a person's death. It cannot be the only part.