[J-1-2017]
IN THE SUPREME COURT OF PENNSYLVANIA
EASTERN DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 727 CAP |
| | : | |
| Appellee | : | Appeal from the Order entered on |
| | : | 5/25/16 in the Court of Common Pleas, |
| v. | : | Berks County, Criminal Division at No. |
| | : | CP-06-0006003-2002 |
| | : | |
| MICHAEL PRUITT, | : | |
| | : | |
| Appellant | : | SUBMITTED: January 9, 2017 |

*OPINION*

**CHIEF JUSTICE SAYLOR**                    **DECIDED: June 20, 2017**

This is a capital post-conviction appeal.

On September 23, 2003, Appellant forcibly entered the Berks County home of Greta A. Gougler, where he robbed, raped, and murdered her. Appellant was arrested, tried, and convicted for first-degree murder, rape, robbery, and other offenses, and a jury returned a death verdict in a capital sentencing proceeding. On direct appeal, this Court affirmed. *See Commonwealth v. Pruitt*, 597 Pa. 307, 951 A.2d 307 (2008).

In 2009, Appellant commenced the present proceedings under the Post Conviction Relief Act, 42 Pa.C.S. §§9541-9546 (the "PCRA"). The post-conviction court conducted a series of evidentiary hearings, throughout which Appellant was represented by the members of the Federal Community Defender Office. Later, per Appellant's request, those attorneys were removed from the representation and current counsel was appointed in their place.

In 2015, Appellant submitted a request to proceed *pro se*. The PCRA court scheduled a proceeding, at which Appellant agreed to continue to be represented by counsel but was deemed by the court to have "knowingly, intelligently and voluntarily abandon[ed] any issues raised by prior PCRA counsel and/or [current counsel] that are not contained in [a] memorandum in support of the PCRA relief petition filed this date[.]" N.T., Nov. 23, 2015, at 9-10.

The PCRA court subsequently denied relief on the remaining claims for relief. This appeal followed, in which Appellant advances six challenges, several of which fall within the category of the claims deemed to have been abandoned by the PCRA court.

**Part I**

Appellant's first three claims, pertaining to DNA evidence presented by the Commonwealth at trial, were found by the PCRA court to have been preserved. The relevant background is as follows.

At trial, the prosecution offered several primary lines of evidence to address Appellant's identity as the robber, rapist, and killer, as well as the *actus reus* of the rape. First, Appellant's confession to police was introduced, in which he admitted to having forcibly entered Ms. Gougler's home and inflicting physical violence upon her, albeit that he denied any intention to kill and maintained that he did not rape the victim. *See* N.T., Apr. 25, 2005, at 174-177. The Commonwealth also presented testimony from a witness to whom Appellant had confessed, extra-judicially, to having perpetrated the physical acts resulting in the victim's death. *See* N.T., Apr. 26, 2005, at 247-48 (testimony of Sean Peterson).

In a second category of evidence, a forensic pathologist testified that the victim had been beaten severely and subjected to ligature strangulation. *See id.* at 355-365. In terms of the rape, the pathologist explained that the victim suffered lacerations and

other injuries to her vagina and anus consistent with nonconsensual penetration. *See id.* at 352-355, 364. Police officers also attested that the victim's body was naked when discovered. *See, e.g.,* N.T., Apr. 25, 2005, at 22, 31.

In the third set of evidence, the Commonwealth sought to confirm the fact of the rape, and Appellant's identity as the rapist, through testimony establishing a match between Appellant's DNA and a sample of genetic material taken from the inner thigh of the victim's body. In this regard, crime-laboratory serologist Michael Brincat testified that this evidence sample contained both blood and sperm cells. *See* N.T., Apr. 26, 2005, at 290-291. Pennsylvania State Police ("PSP") forensic scientist Lisa Mihalacki then testified that she segregated the sample into male and female components and conducted DNA analysis. According to the witness: "Every genetic marker, every place that we checked from this sample and [Appellant's] were identical to each other," resulting in between a one in 1.5 billion and a one in 39 billion chance that another person might have contributed the sample (with the variation accounted for by racial differences within the population). *Id.* at 313-314.[1] On cross-examination, Appellant's

---

[1] The DNA analysis discussed at trial and in the post-conviction proceedings was presented in the form of numerical expressions of the length of repeat DNA sequences found at discrete locations, or loci, on a chromosome. At each locus, testing generally produces measurements for two DNA fragments, or allele, one contributed by each of the subject's parents. *See* N.T., Apr. 26, 2005, at 316-17. *See generally Commonwealth v. Blasioli,* 552 Pa. 149, 154-58, 713 A.2d 1117, 1119-23 (1998) (discussing the science underlying forensic DNA analysis); 1 KENNETH S. BROUN, 1 MCCORMICK ON EVIDENCE §205 (2013) (explaining the use of DNA profiling to detect the number of repeats, at given locations, for different alleles on a graph known as an electropherogram).

For example, the expression "D13S317 11, 12," taken from Ms. Mihalacki's report as it concerns the male component of the evidence sample taken from the victim's thigh, signifies that, at the loci denominated D13S317, a particular genetic sequence repeated itself 11 times in one of two DNA fragments, and 12 times for the other.

lawyer initially pointed out that the DNA data reflected that there was more than one contributor to the portion of the evidence sample denominated as the male component. *See id.* at 316-320.[2] The remainder of the cross-examination focused on racial differences in the population samples and the handling of the evidence samples. *See id.* at 320-323.

In the post-conviction proceedings, Appellant contended that there were multiple flaws in the Commonwealth's DNA analysis and that his trial counsel were derelict in failing to apprehend and capitalize upon such deficiencies.[3] In support, Appellant presented testimony from Randal T. Libby, PhD, a forensic geneticist. Dr. Libby testified that the "male" component of the evidence sample taken from the victim's thigh was of a low-template quality and, accordingly, generated a great deal of subjectivity in interpreting the testing result. *See, e.g.,* N.T., Aug. 21, 2013, at 32-38, 59, 62, 64-65, 80.[4]

Indeed, it was Dr. Libby's opinion that the sample contained insufficient DNA to yield a reliable analysis. *See id.* at 51, 87. This, the geneticist explained, was reflected, *inter alia,* in the absence of any data whatsoever in Ms. Mihalacki's report pertaining to

---

[2] As noted, ordinarily, each genotype found at a particular chromosomal location will generate two numbers, one deriving from the DNA strand inherited from the contributor's mother and one from the father. *See supra* note 1. However, several of the genotypes reflected in Ms. Mihalacki's report assigned to the female component of the evidence sample taken from the victim's thigh contained more than two numbers, thus indicating the presence of multiple contributors.

[3] Appellant was represented at trial by two attorneys, one of which took the lead at the guilt phase. *See* N.T., Dec. 19, 2013, at 1049.

[4] *See generally* Erin Murphy, *The Art in the Science of DNA: A Layperson's Guide to the Subjectivity Inherent in Forensic DNA Typing,* 58 EMORY L.J. 489, 503–08 (2008) (discussing stochastic effects such as allelic dropout in terms of introducing subjectivity in DNA analysis of low-template samples).

alleles at three loci for the male evidence sample. *See id.* at 54, 65-66. Additionally, Dr. Libby affirmed that this report itself indicated that results at five loci were "[i]nconclusive due to an insufficient amount of DNA." *Id.* at 62-63.

Dr. Libby also found the interpretive enterprise to have been further complicated by the obvious presence of multiple contributors (as was alluded to during cross-examination at trial). *See id.* at 47, 68-70; *see also supra* note 2. Moreover, he posited that the results of Ms. Mihalacki's analysis in fact suggested that Appellant should be excluded as a contributor to the evidence sample. *See, e.g.,* N.T., Aug. 21, 2013, at 51, 54-55, 95. It was also the geneticist's opinion that there were too many inconsistencies in the data to justify the use of a statistical analysis to support the probability estimates that Ms. Mihalacki offered in her testimony. *See id.* at 94.[5]

In terms of Ms. Mihalacki's assertion at trial of a match at every genetic marker, Dr. Libby testified that such testimony was demonstrably false according to her own report. *See id.* at 73-75. Dr. Libby further attested that the conclusion that the male component of the evidence sample contained sperm was unverifiable, since sperm tails

---

[5] For example, Dr. Libby observed an inconsistency in Ms. Mihalaki's interpretive assumptions pertaining to potentially homozygous alleles. In this regard, assuming a robust sample of genetic material, where a single allele is detected at a particular location, it is generally appropriate to assume the subject has two of the same alleles at that location, which are termed homozygous. *See* N.T., Aug. 21, 2013, at 45.

The inconsistency in assumptions arose as follows. At one locus Ms. Mihalaki assumed that the genotype for the evidence sample was homozygous because the testing revealed a single length allele; whereas, at another locus, Ms. Mihalaki assumed that a result reflecting a single length allele was incomplete. *See id.* at 64. Notably, Appellant's genotype reflected two different alleles at the marker location, thus indicating a mismatch (and concomitant exclusion of Appellant as a contributor to the evidence sample), were the evidence sample alleles to be deemed homozygous.

Dr. Libby opined that there was no scientific reason, nor anything appearing in the scientific data, to explain Ms. Mihalaki's shifting assumptions. *See id.* at 64-65.

were undetectable upon microscopic examination. *See id.* at 75-79. Finally, Dr. Libby noted that data from Ms. Mihalaki's initial analysis of the evidence sample, which she apparently had discounted in favor of further testing, had resulted in an affirmative exclusion of Appellant as a possible contributor to the evidence sample. *See id.* at 133. In this regard, Dr. Libby suggested that Ms. Mihalaki's methodology conflicted with the scientific norm of reproducibility. *See id.* at 130-134.

Appellant also presented testimony from his lawyer primarily responsible for his representation at the guilt phase of trial. The attorney testified that he was not significantly concerned with the DNA evidence, because the Commonwealth already had adduced compelling physical evidence demonstrating the fact of rape via the testimony of a forensic pathologist, and moreover, "there was only [Appellant] in the room." N.T., Dec. 19, 2013, at 1201; *see also id.* at 1196 ("[A]ll the DNA did was identify, really identifying [Appellant] as the person who committed the rape. But, you know, the fact of the rape was there, though, and there was no evidence of anybody else being there, so I didn't think it added much."); *id.* at 1219. Counsel explained that he did not wish to draw undue attention to evidence that he considered unimportant. *See id.* at 1202.

Nevertheless, the lawyer affirmed that the Commonwealth's DNA evidence presented a strong indication of Appellant's culpability for rape. *See id.* at 1208. In spite of such materiality, counsel testified that he did not understand the data in Ms. Mihalaki's report and merely relied on her representation of a genetic match between the evidence sample and the sample taken from Appellant. *See id.* at 1207. With reference to the data reflected in the report, the attorney also indicated: "I don't imagine any lawyer would know how that got from A to B or what that means." *Id.* at 1208.

## A. Failure to Investigate, Effectively Cross-examine, and Present an Expert

Presently, based on the above, Appellant contends that his counsel failed to conduct a professionally reasonable investigation and rendered deficient stewardship at trial. Appellant argues that, at a minimum, his trial counsel had an obligation to garner at least some rudimentary understanding of the evidence being used against him. He also takes the position that counsel should have consulted with and presented testimony from a defense expert. *See* Brief for Appellant at 16-17 (collecting cases). According to Appellant, trial counsel "essentially conducted the cross-examination of the Commonwealth's DNA expert on the fly." *Id.* at 15. In terms of the materiality of the DNA evidence and its prejudicial impact, Appellant couches it as the "sole forensic evidence linking [him] to the crime" and posits that it played a pivotal role at trial. *Id.* at 16. He concludes that there is a reasonable probability that the jury would have found reasonable doubt to exist had counsel investigated and challenged the Commonwealth's DNA evidence in an effective manner.[6]

At the outset, we find arguable merit in Appellant's challenge to his lawyer's stewardship and conclude that counsel could have had no reasonable strategy to support his failure to gain a better understanding of Ms. Mihalaki's report.[7] Contrary to

---

[6] The Pennsylvania test for ineffective assistance of counsel is, in substance, the same as the two-part performance-and-prejudice standard set forth by the United States Supreme Court, *see Strickland v. Washington,* 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984), although this Court has divided the performance element into two sub-parts dealing with arguable merit and reasonable strategy. Accordingly, to succeed on an ineffectiveness claim, a petitioner must establish that: the underlying legal claim has arguable merit; counsel had no reasonable basis for her action or inaction; and the petitioner suffered prejudice as a result. *See Commonwealth v. Pierce,* 515 Pa. 153, 158–60, 527 A.2d 973, 975–76 (1987).

[7] *Accord Driscoll v. Delo,* 71 F.3d 701, 709 (8th Cir. 1995) (explaining that "a reasonable defense lawyer would take some measures to understand the laboratory tests performed and the inferences that one could logically draw from the results" linking his (continued...)

counsel's comment that no lawyer would apprehend the underlying data, *see* N.T., Dec. 19, 2013, at 1208, the present record reflects that Appellant's post-conviction lawyers amply comprehend it, including the multiple problems stemming from Ms. Mihalaki's interpretation of a partial genetic profile taken from a low-template evidence sample.[8] Moreover, counsel's failure to appreciate -- and exploit -- the fact that the data in Ms. Mihalaki's initial report apparently indicated an affirmative *exclusion* of Appellant as a contributor to the male evidence sample, *see* N.T., Aug. 21, 2013, at 133-134, is simply inexplicable. To the degree that counsel was unable to understand the test results on his own, plainly he should have consulted an expert.[9]

Given the potency of DNA evidence, *see, e.g., McDaniel v. Brown*, 558 U.S. 120, 136, 130 S. Ct. 665, 675 (2010) (commenting upon the "persuasiveness of [DNA] evidence in the eyes of the jury"), were this a case in which identity was in controversy, we would likely find prejudice to be manifest. Here, however, Appellant's identity as the robber and killer has never seriously been put into contest, even at the post-conviction

---

(...continued)
client to a murder weapon); *Couch v. Booker*, 632 F.3d 241, 246 (6th Cir. 2001) ("To make a reasoned judgment about whether evidence is worth presenting, one must know what it says.").

[8] *See generally* DAVID L. FAIGMAN, JEREMY A. BLUMENTHAL, EDWARD K. CHENG, JENNIFER L. MNOOKIN, ERIN E. MURPHY & JOSEPH SANDERS, 4 MOD. SCI. EVID. § 31:32 (2013–2014) ("It is fair to say that [low copy number DNA] typing is the subject of great dispute among some of the leading lights in the forensic community."); BROUN, 1 MCCORMICK ON EVIDENCE §205 ("Even with existing systems, efforts to push [an amplification technique] to its limits in copying only DNA fragments from a few cells (low template or touch DNA samples) have generated controversy."); Bruce Budowle, Arthur J. Eisenberg & Angela van Daal, *Low Copy Number Typing Has Yet to Achieve "General Acceptance"*, FORENSIC SCIENCE INT'L: GENERAL SUPPLEMENT SERIES 2 551–52 (2009).

[9] *Accord Gersten v. Senkowski*, 426 F.3d 588, 611 (2d Cir. 2005) (determining that an attorney was ineffective when he "failed to consult or call an expert . . . or to educate himself sufficiently on the scientific issues.").

stage. *Accord* N.T., Dec. 20, 2013, at 1298 (reflecting the attestation of Appellant's trial counsel that Appellant consistently confirmed the facts that he had related to the police, which included his perpetration of a violent attack upon the victim). Although Appellant did not admit to having perpetrated the rape, the fact of such crime was apparent from the physical evidence, and Appellant has never provided any plausible explanation that would persuasively suggest any other person's involvement in the relevant events that took place in the victim's house. *Accord* N.T., Dec. 20, 2013, at 1298 (memorializing trial counsel's testimony that Appellant never indicated that anyone other than he and the victim was present during their encounter).[10] For these reasons, in our considered judgment – while trial counsel should have provided more able stewardship relative to the DNA evidence – Appellant has not established a reasonable probability that the verdict would have been different had counsel done so, *i.e.*, a probability sufficient to

---

[10] At the post-conviction stage, Appellant did adduce some evidence that Appellant was in the presence of a Hispanic man when he decided to "get more money," presumably in a timeframe in temporal proximity to the murder. *See* N.T., Jan. 16, 2014, at 1452-1453. Moreover, trial counsel affirmed that, after the murder, a "tipster" apparently had reported to police that he had seen black and Hispanic males in the victim's yard on the night of the killing. N.T., Dec. 20, 2013, at 1198-1199. No evidence was introduced at trial or in the post-conviction proceedings, however, to the effect that a second intruder ever entered the victim's house, and Appellant does not make any allusion to such a person in the present briefing.

Justice Wecht takes the opportunity to explain that the burden at trial was never on Appellant to suggest another's involvement in the crimes. *See* Dissenting Opinion, *slip op.* at 10. As we have indicated, however, in the present posture of the case – on review of claims of deficient stewardship at the post-conviction stage -- the burden lies squarely with Appellant. *See supra* note 6.

As also discussed above, the circumstantial evidence of Appellant's perpetration of the rape is very strong, again, arising out of his forcible entry into the victim's residence and his otherwise brutal treatment of the victim, and in the absence of evidence that any other potential perpetrator had entered the home during the time frame in which the victim was brutalized, raped, and killed.

undermine confidence in the outcome of the proceedings. *See Commonwealth v. Laird*, 632 Pa. 332, 343, 119 A.3d 972, 978 (2015).

## B. Assertedly False Testimony and Alleged Concealment of Evidence

In his second line of argument, Appellant focuses on Ms. Mihalaki's testimony that "[e]very genetic marker, every place that we checked from this sample and [Appellant's] were identical to each other." N.T., Apr. 26, 2005, at 313. According to Appellant, he was denied due process and the effective assistance of counsel on the basis of this assertedly false attestation.

Appellant supplements this argument with a series of allegations concerning the involvement of a former PSP serologist, Ranae Houtz, in the forensic analysis. Appellant explains that trial counsel was aware that Ms. Houtz bore the responsibility for submission to the DNA laboratory of the samples taken from the victim, *see* N.T., Dec. 19, 2013, at 1209, and that her job performance previously had been questioned by her superiors and others, ultimately resulting in her termination. *See id.* at 1212-1213. Appellant points to one error made by Ms. Houtz in his case, in which she had mislabeled one of the evidence samples. *See* Brief for Appellant at 44-45. Appellant also charges that "[t]he testimony of Ms. Mihalacki and Mr. Brincat was crafted to conceal the involvement – and errors – of [Ms.] Houtz, who was initially assigned to the case and who resigned from the [PSP] after repeated errors were detected in her work." *Id.* at 43. According to Appellant, his lawyers should have sought discovery regarding Ms. Houtz's performance, undertaken to have her work reviewed by a defense expert, and impeached the testimony of Commonwealth expert witnesses based on Ms. Houtz's involvement, which those witnesses failed to disclose to the jurors. *See id.* at 45 ("Ms. Mihalacki and Mr. Brincat testified falsely regarding Ms. Houtz's involvement

and error in this case, concealing from the jury that crucial evidence was processed and tested by a forensic scientist whose repeated errors forced her resignation and called into question her work in over 600 cases.").

To the degree that Appellant attempts to frame the issue as one of direct trial court error, the claim is waived for failure to advance it at trial. *See, e.g.,* *Commonwealth v. Keaton*, 615 Pa. 675, 693, 45 A.3d 1050, 1060 (2012) (explaining that an issue is waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal, or in a prior state postconviction proceeding" (quoting 42 Pa.C.S. §9544(b)). Moreover, despite the aspersions cast upon the Commonwealth, Ms. Mihalacki's report straightforwardly disclosed, *inter alia,* the absence of data at five loci. *See* N.T., Aug. 21, 2013, at 62-63 (reflecting the report's admonition that the report itself indicated that results at five loci were "[i]nconclusive due to an insufficient amount of DNA"). While clearly she should have been more careful in her testimony at trial, affording her the benefit of the doubt, Ms. Mihalacki's overstatement may have reflected an attempt to express her belief that Appellant's profile matched the evidence sample at the genetic markers for which data was present. Notably, Appellant's own expert recognized that, although there is disagreement concerning the scientific validity of such an approach, various laboratories will declare DNA matches based on partial profiles. *See* N.T., Aug. 21, 2013, at 60.[11]

With regard to Ms. Houtz, before trial the Commonwealth discussed her involvement with defense counsel and explained that the serology testing had been

___

[11] This author has previously expressed the concern that the methodology used in the profiling of low-template DNA samples may not have gained the degree of general acceptance in the scientific community required to meet the standard of admissibility for novel scientific evidence in Pennsylvania. *See Commonwealth v. Treiber*, 632 Pa. 449, 539-40 & n.18, 121 A.3d 435, 489 & n.18 (2015) (Saylor, C.J., dissenting); *see also supra* note 8. Appellant, however, has not invoked that standard in this appeal.

repeated by Mr. Brincat. *See, e.g.*, N.T., Dec. 19, 2013, at 1398-1399. Mr. Brincat's report also indicated -- in bold capital type -- that the relevant samples of genetic material had been submitted to the DNA laboratory in October 2002, about five months before Mr. Brincat testified that he began his own testing of samples pertaining to Appellant's case. *See* N.T., Apr. 26, 2005, at 301. This too, then, was information readily available to counsel.

In terms of the ineffectiveness dynamic, we express reservations concerning trial counsel's performance similar to those indicated in our treatment of Appellant's initial claim, above. Plainly, in response to Ms. Mihalacki's assertion of a match at every genetic marker incorporated into the testing, counsel should have confronted the witness with her own report disclosing missing data at five loci. Counsel was also armed with enough information to disclose Ms. Houtz's involvement in the initial testing and in the chain of custody underlying the DNA analysis.

In any event, our resolution of the issue again turns on Appellant's inability to establish prejudice in light of the compelling other evidence establishing his identity as the robber and killer and the fact of a rape, and the absence of any plausible alternative theory to discount that Appellant was also the rapist.

## C. Cumulative Effect of Alleged *Napue* and *Brady* Violations

Appellant next characterizes the assertedly false testimony and alleged concealment of evidence as violations of *Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 1177 (1959) (holding that the knowing use of false testimony to obtain a conviction violates due process), and *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97 (1963) (reflecting the obligation, on the part of prosecutors, to disclose exculpatory information material to the guilt or punishment of an accused). Appellant catalogues the asserted taints as follows:

- The Commonwealth presented Ms. Mihalacki's false and misleading testimony that [Appellant's] DNA matched the perpetrator's DNA;

- The Commonwealth presented Mr. Brincat's false and misleading testimony concealing the involvement of Ms. Houtz in preparing samples used in DNA testing;

- The Commonwealth presented Ms. Mihalacki's false and misleading testimony concealing the involvement of Ms. Houtz in preparing samples used in DNA testing;

- The Commonwealth suppressed evidence that would have revealed the false and misleading testimony of Mr. Brincat;

- The Commonwealth suppressed evidence that would have revealed the false and misleading testimony of Ms. Mihalacki;

- The Commonwealth suppressed evidence that would have exposed at least one error by Ms. Houtz during her preparation of samples for DNA testing; and

- The Commonwealth suppressed evidence indicating that other errors may have been made in the handling and testing of the samples.

We reiterate that the Commonwealth had disclosed to the defense both that the evidence sample taken from the victim's thigh resulted in an incomplete DNA profile and that Mr. Brincat was tasked with repeating the serology analysis previously undertaken by Ms. Houtz. Particularly since this information was known (or, at the very least, should have been known) to counsel, the attorney apparently could have presented at trial precisely the same challenges as are reflected in the present briefing. As such, we find the instant claim to be unpreserved in its entirety. *See Commonwealth v. Cousar*, ___ Pa. ___, ___, 154 A.3d 287, 301 (2017) ("*Brady* claims . . . may be subject to waiver."); *cf. Routly v. Singletary*, 33 F.3d 1279, 1286 (11th Cir. 1994) ("There is no

violation of due process resulting from prosecutorial non-disclosure of false testimony if defense counsel is aware of it and fails to object.").

## Part II

The PCRA court deemed all remaining claims to have been abandoned by Appellant, who, in the present briefing, vigorously challenges this conclusion.[12] With reference to the abandonment, the PCRA court conducted a discussion with post-conviction counsel and a colloquy with Appellant which unfolded as follows.

The court had scheduled a proceeding to address Appellant's request to proceed *pro se*. At the outset, the attorney for the Commonwealth announced that the defense intended to withdraw all claims for relief pertaining to the penalty phase of trial and requested a colloquy to confirm Appellant's wishes. *See* N.T., Nov. 23, 2015, at 2. Appellant's counsel responded that the parties were in agreement that counsel could file a revised memorandum elaborating upon specific claims for relief, and that counsel would continue to represent Appellant. *See id.* at 3.

In the ensuing colloquy, Appellant confirmed that he was satisfied for counsel to continue with the representation and stated: "I'm asking for a ruling on the DNA evidence; that's the issue I'm asking for the ruling." *Id.* at 5. Counsel then confirmed this assertion. *See id.* ("We're asking for a new trial based upon ineffective assistance of counsel in handling the various aspects of the DNA evidence through the course of

---

[12] Appellant seeks to present three claims in addition to those discussed in Part I, above. These include: an allegation of prosecutorial misconduct; a challenge asserting due process violations and ineffective assistance in the failure of trial counsel to contest the admission of Appellant's pretrial statements; and a final claim of deficient process and attorney stewardship relating to counsel's failure to locate and retain a credible pathologist to assist the defense.

trial."). According to the post-conviction lawyer, Appellant was "making a knowing, conscious decision to abandon those issues that are not contained in the pages of [the] brief" that was to be filed that day. *Id.*

The PCRA court read into the record the headings of each issue to be preserved, which mirror the titles of the three subparts of Part I of this opinion. *See id.* at 6-7. The court then told PCRA counsel: "You now have three issues. Three issues. They are all DNA related. That's all you need to discuss because the defendant has said that he's not pursuing anything else." *Id.* at 8. The court then dictated the following order without objection:

> AND NOW, this 23rd day of November, 2015, the Court having conducted a colloquy with regard to the status of the defendant's amended PCRA petitions with the defendant's defense counsel [and the attorney for the Commonwealth], we find that the defendant is knowingly, intelligently and voluntarily abandoning any issues raised by prior PCRA counsel and/or [present counsel] that are not contained in the memorandum in support of the PCRA relief petition filed this date by [present counsel]. The issues raised in this memorandum relate to the DNA evidence presented at trial.

*Id.* at 9-10.[13]

Presently, citing to a decision involving a waiver of the right to counsel, Appellant contends that a post-conviction court is required to conduct a specific, "probing colloquy" before permitting any claims to be abandoned. Brief for Appellant at 61 (quoting *Commonwealth v. Starr*, 541 Pa. 564, 581-82, 664 A.2d 1326, 1335 (1995)).

---

[13] Seven months after the proceeding, Appellant filed a "Nunc Pro Tunc Statement to Correct the Record," asserting that he intended to abandon only penalty-phase claims and that all guilt-phase claims should be deemed to be preserved. The PCRA court found that no action was necessary on this statement, since "the record of the November 23, 2015 colloquy speaks for itself." Memorandum to Clerk of Courts Official File dated July 26, 2016, in *Commonwealth v. Pruitt*, No. 6003-02 (C.P. Berks).

Appellant takes the position that the PCRA court failed to conduct an adequate colloquy so as to clarify what issues he was agreeing to forego. According to Appellant, the court proceeding was "rather confusing in its nature," as, for example, it opened with a discussion of the abandonment of only penalty-phase issues. *Id.* at 63. Furthermore, he asserts that he "expected that the Court would make a decision on his request for Summary Judgment on the DNA claims then he would be able to proceed further with all guilt phase PCRA issues, if necessary." *Id.* By way of additional support, Appellant references *Commonwealth v. Saranchak*, 570 Pa. 521, 810 A.2d 1197 (2002), as an instance in which this Court sanctioned the reassertion of previously abandoned post-conviction claims.

Initially, we differ with Appellant's position that a developed colloquy is an essential prerequisite to the withdrawal of some claims presented in a post-conviction petition. To the contrary, the advancement of particular challenges to a judgment of sentence is generally considered to be a strategic matter relegated to the sound judgment of counsel. *See Jones v. Barnes*, 463 U.S. 745, 751-52, 103 S. Ct. 3308, 3313 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."); *accord Commonwealth v. Jette*, 611 Pa. 166, 184, 23 A.3d 1032, 1043 (2011).

Here, we recognize that counsel's strategic calculations may not have been the driving force pertaining to the abandonment of at least some of the previously asserted claims. For example, there are suggestions on the record that Appellant was opposed to pursuing penalty-phase relief.

Nevertheless, at the time of the relevant proceedings before the PCRA court, counsel apparently applied his professional judgment in accommodating his client's

wishes on the subject of abandonment. Although we agree with Appellant that those proceedings initially opened with a focus upon the abandonment of penalty-phase claims, as reflected above, they took a different turn toward the identification of discrete issues that counsel and Appellant agreed were to be pursued, to the exclusion of all others. This approach is expressly manifested in the admonitions and order of the PCRA court, to which no contemporaneous objection was lodged.

With regard to the *Saranchak* decision, in that case the petitioner had withdrawn his post-conviction petition in its entirety. *See Saranchak*, 570 Pa. at 523, 810 A.2d at 1198. We find such scenario to be materially distinct from a winnowing of extensive claims presented to a post-conviction court. In this regard, again, we also differ with Appellant's position that a colloquy is necessary to support foregoing discrete post-conviction claims -- indeed, such decisions are routinely made outside of the presence of the courts.[14]

We conclude that the record supports the PCRA court's determination that Appellant abandoned claims other than those addressed in Part I of this opinion.


The order of the post-conviction court is affirmed.

Justices Baer, Todd, Donohue, Dougherty and Mundy join the opinion.

Justice Wecht files a dissenting opinion.

---

[14] Appellant's categorical abandonment of all penalty-phase claims presents the circumstance most analogous to the waiver of all claims at issue in *Saranchak*. Notably, however, Appellant does not seek to advance any penalty-phase issues in this appeal.