[J-1-2017] [MO: Saylor, C.J.]

## IN THE SUPREME COURT OF PENNSYLVANIA
## EASTERN DISTRICT

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 727 CAP |
| | : | |
| Appellee | : | Appeal from the Order entered on May |
| | : | 25, 2016 in the Court of Common Pleas, |
| | : | Berks County, Criminal Division at No. |
| v. | : | CP-06-0006003-2002. |
| | : | |
| | : | SUBMITTED: January 9, 2017 |
| MICHAEL PRUITT, | : | |
| | : | |
| Appellant | : | |

## DISSENTING OPINION

**JUSTICE WECHT**                                                            **DECIDED: June 20, 2017**

I share the learned Majority's view that there is arguable merit in Michael Pruitt's challenge to the effectiveness of his trial counsel, and that counsel could have had no reasonable strategic basis for failing to investigate, to understand, or to rebut the Commonwealth's presentation of DNA evidence at trial. I part ways with the Majority in regard to the analysis of prejudice. Unlike the Majority, I conclude that Pruitt suffered prejudice from his trial counsel's manifest dereliction, because there exists a reasonable probability that, but for that dereliction, the jury would have been left with reasonable doubt as to Pruitt's culpability for rape and involuntary deviate sexual intercourse ("IDSI").

Regardless of any concomitant impact upon Pruitt's conviction for first-degree murder, acquittal of those felony sexual offenses would have been likely to alter the ultimate outcome of the proceedings, in that the jury may have assigned lesser weight to the sole aggravating circumstance that it found during the penalty phase—that Pruitt

killed Greta Gougler while in the perpetration of a felony. *See* 42 Pa.C.S. § 9711(d)(6). Identification and exploitation of weaknesses in the Commonwealth's forensic evidence—and recognition that the Commonwealth's expert overstated the strength of that evidence at trial—could have raised a reasonable doubt regarding Pruitt's guilt of these heinous sexual offenses, and, in turn, weakened substantially the Commonwealth's capital case at the penalty phase. It follows that there is a reasonable probability that counsel's failure to challenge the DNA evidence made the difference between a sentence of life imprisonment and a sentence of death. As this was "sufficient to undermine confidence in the outcome of the proceeding,"[1] so as to establish prejudice, I conclude that Pruitt's trial counsel was constitutionally ineffective. Accordingly, I respectfully dissent.

## I. The DNA Evidence

Pruitt was convicted of first-degree murder, robbery, burglary, rape, and IDSI. To prove the sexual offenses, the Commonwealth presented evidence relating to the testing of genetic material that was recovered from Greta Gougler's inner thigh. Full comprehension of Pruitt's claims regarding this evidence requires a brief description of the testing methodology and the conclusions that may be drawn from that testing.

"DNA is genetic material found in most types of cells of the human body, including white blood cells and cells contained in semen and hair follicles." *Commonwealth v. Blasioli*, 713 A.2d 1117, 1119–20 (Pa. 1998). DNA is organized in twenty-three pairs of chromosomes, with one half of each pair inherited from the mother and the other half from the father. David H. Kaye, *DNA Evidence: Probability, Population Genetics, and the Courts*, 7 HARV. J.L. & TECH. 101, 107 n.35 (1993). The

---

[1] *Commonwealth v. Laird*, 119 A.3d 972, 978 (Pa. 2015).

functional components of DNA are groups of molecules known as "nucleotides," which join in predictable pairs known as "base pairs" and, when organized in a particular sequence, serve as a code for a specific biological trait. *Blasioli*, 713 A.2d at 1120. What we refer to as a "gene" is a specific sequence of base pairs that is responsible for the expression of an individual human characteristic. *Id.* "Genes are the functional units of the DNA molecule." JUSTICE MING W. CHIN ET AL., DNA BIOLOGY, FORENSIC DNA EVIDENCE: SCIENCE AND THE LAW § 2:2 (2017 ed.) (hereinafter "CHIN"). Each gene may be found at a particular "locus," which "represents a specific physical location of a gene on a chromosome." Kimberly Cogdell Boies, *Misuse of DNA Evidence Is Not Always A "Harmless Error": DNA Evidence, Prosecutorial Misconduct, and Wrongful Conviction*, 17 TEX. WESLEYAN L. REV. 403, 408 (2011) (hereinafter "Boies").

Most of a person's DNA is identical to that of every other person, with only approximately three million out of a total of three billion base pairs varying between individuals. *Blasioli*, 713 A.2d at 1121. These variations are called "polymorphisms," and they serve as the basis for DNA identification. *Id.* A particular variation is known as an "allele," an "alternative form of a gene that can occupy a particular chromosomal locus." Boies at 408 (quoting *United States v. Chischilly*, 30 F.3d. 1144, 1153 (9th Cir. 1994)). An allele also may be described as a "specific pattern of base pairs at a given location on a given chromosome." CHIN at § 2.2. Because individuals inherit genetic material from both parents, there are exactly two alleles at any given polymorphic locus on any given set of complementary chromosomes. *Id.* One allele comes from an individual's mother, and the other comes from the individual's father.

Most commonly, DNA testing is conducted through the identification of alleles by analyzing repeating sequences of base pairs at a particular locus, called "short tandem repeats" ("STR"). Comparison of DNA samples involves the identification of STRs at

standardized, designated loci on certain non-coding areas of the DNA strand. These areas are not responsible for the expression of any particular biological trait, but nonetheless contain allelic variations that can be compared to a sample of DNA from a known source. CHIN at §§ 2.2, 2.3.

> The variability of STR patterns between people is due to the fact that while every person has short repeating sequences of base pairs at the loci used for forensic identification . . . the number of repeats differs. For example, at a particular locus, a person may have inherited 12 repeats from her mother and 14 repeats from her father. STRs are "short" because they are only two to six chemical letters long, "tandem" because they are on adjacent chromosomes, and "repeat" because the pattern repeats. One would say that this person's alleles at that locus are "12,14." A person may receive the same allele from both mother and father at a locus, resulting in a "homozygous" allele pairing of, for example, "16,16." A locus where the two alleles differ is called "heterozygous," for example, "12,14."
>
> In forensic DNA laboratory reports, a homozygous locus is often indicated with a single number, e.g., "16." When two DNA profiles are compared side-by-side, a match means that the DNA could have come from the same source, a determination that is informed . . . by the statistical rarity of the DNA profile at issue.

*Id.* at § 2.3.

Although the term "match" often is employed when comparing the results of STR analysis, the "more accurate description is that the individual is 'included' as opposed to 'excluded.'" Boies at 413. Using the above example of possible allele pairings, if testing of Sample A and Sample B reveals an allele pairing of "12, 14" at a given locus for both samples, then the samples *could* have come from the same source, and continued matches at additional loci increase the probability that the samples originated from the same individual, or, rather, decrease the probability that the samples came from different individuals. The individual from whom Sample A was taken remains "included" within the set of individuals who could have provided Sample B. If, however, Sample A reveals an allele pairing of "12, 14" at a specified locus, and Sample B

reveals an allele pairing of "16" (indicating a homozygous pairing of "16, 16"), then there is no match between the samples at that locus. Because identical samples will have identical allele pairings, it follows necessarily that the individual from whom Sample A was taken is not the same individual from whom Sample B was taken, so the former is "excluded" as a possible source of the latter.

In the instant case, the sample at issue was collected from Gougler's inner thigh, and contained DNA from multiple individuals, ostensibly from both Gougler and her rapist. To obtain usable information from this sample, the Pennsylvania State Police's forensic scientist, Lisa Mihalacki, extracted two DNA fractions. Mihalacki's report explained: "The non-sperm fraction (F) is enriched for DNA from sources such as white blood cells or epithelial cells (as found in vaginal fluid). The sperm fraction (M) is enriched for DNA from spermatozoa." DNA Report, 5/5/2003, Commonwealth's Exhibit No. 65, at 1. STR analysis of the fractions, revealing the allele pairings at specified loci for both the male and female contributors, then could be compared to known blood samples from both Gougler and Pruitt. Of the fifteen loci tested, Mihalacki's analysis produced no data whatsoever for three loci of the sperm fraction sample, and the data at two loci did not match the results from Pruitt's known blood sample. Mihalacki reported that the results at all five of these loci were "inconclusive due to an insufficient amount of DNA." *Id.* at 2.

Nevertheless, as the Majority notes, Mihalacki testified at Pruitt's trial that, with regard to the sperm fraction sample, "[e]very genetic marker, every place that we checked from this sample and Michael Pruitt's were identical to each other." *See* Maj. Op. at 3; Notes of Testimony ("N.T."), 4/26/2005, at 313. As Mihalacki's own report demonstrated, her statement was false. Mihalacki proceeded to opine that, based upon her calculations, the odds of the sperm fraction sample coming from anyone other than

Pruitt were between one in 1.5 billion and one in 39 billion. *Id.*[2] Pruitt's trial counsel failed to confront Mihalacki with the inconsistencies between her testimony and the conclusions that she drew in her report, failed to challenge Mihalacki's methodology or the reasoning behind her conclusions, and failed to present an expert witness to provide an alternative interpretation of the DNA evidence.[3]

In the post-conviction proceedings, Pruitt presented an expert opinion regarding the Commonwealth's DNA evidence from Randal T. Libby, Ph.D., a forensic geneticist. Dr. Libby opined that Mihalacki's analysis of the DNA testing reflected too many inconsistencies to permit reliable conclusions. Dr. Libby observed that, even with regard to the comparison between a known sample of Gougler's DNA and the female fraction of the thigh swab, which should have produced a perfect match, there were troubling inconsistencies. For instance, at locus "Penta E," Gougler's known sample revealed an allele pairing of "5, 13." However, no "13" allele was discovered at that locus in either fraction of the thigh swab sample. For Dr. Libby, that was a "red flag" that there were "some problems with the testing procedure." N.T., PCRA Hearing, 8/21/2013, at 54.

With regard to the sperm fraction, which Mihalacki attributed to Pruitt, Dr. Libby noted that the absence of any data at three loci confirmed that the testing process was deficient, in that those loci represented "three significant sites in which there's a failure of the system." *Id.* He noted further that the results of the testing of the sex chromosome revealed additional problems. Although every male has both an "X" and a

---

[2] Mihalacki explained that this statistic actually represents "the probability that somebody . . . in the world could have the same genetic profile." N.T., 4/26/2005, at 321.

[3] As the Majority notes, Pruitt was represented by two attorneys at trial.

"Y" sex chromosome, the sperm fraction produced only a "Y" chromosome. Because an "X" chromosome should have been detected regardless of whether the sample came from a male or a female, its absence was "significant" and suggested that "they're not detecting all of the DNA which could be present in the sample." *Id.* at 57. This failure cast doubt upon the results at all of the tested loci. *Id.* at 57.

Most significantly, Dr. Libby observed that, at locus "FGA," Pruitt's known sample revealed an allele pairing of "22, 23," but the sole allele detected in the sperm fraction was "22." Taken at face value, Dr. Libby explained, the results could indicate that the source of the sperm fraction was homozygous at that locus, with an allele pairing of "22, 22." Because Pruitt has a "23" allele that was not present in the sperm fraction, the testing results at locus FGA potentially *excluded* Pruitt as a contributor to the DNA sample collected from Gougler's thigh. *Id.* at 57-58. Mihalacki reported the results at locus FGA as "inconclusive" due to an insufficient quantity of DNA. However, Mihalacki's testing of the sperm fraction at locus "D18S51" similarly indicated the presence of only one allele, "16." Yet, Mihalacki did not determine that the results at this locus were inconclusive; she concluded that the source of the sperm fraction was homozygous ("16, 16") at that locus, which was consistent with the allele pairing from Pruitt's known DNA sample. Dr. Libby found no support for Mihalacki's conclusion that, where an apparent homozygous allele pairing matched Pruitt's profile, there was a match, but, where the same test of the same sample revealed a homozygous allele pairing that was inconsistent with Pruitt's profile, the results were "inconclusive." *Id.* at 64-65.

Further highlighting the tenuousness of Mihalacki's conclusions, Dr. Libby noted the possibility that some of Gougler's DNA could have been present in the sperm fraction, allowing for misattribution of certain alleles in the sperm fraction. Dr. Libby

noted that "there's oftentimes spillover of fractions, especially if they're disproportionate [in the] quantities of one type of DNA . . . versus another source. So it would not be unusual to find a victim's profile in the [sperm] fraction." *Id.* at 69. As such, Dr. Libby opined that, where the results at certain loci revealed alleles common to Gougler's sample, Pruitt's sample, and the sperm fraction, "it's not probative at all since Ms. Gougler's profile would be consistent with the evidence sample as would Mr. Pruitt['s]." *Id.* at 70. After redacting the alleles that Gougler shared with the sperm fraction and, thus, eliminating the alleles that Gougler could have contributed, Dr. Libby concluded that there were only three unique loci in the sperm fraction that were consistent with Pruitt's genetic profile. *Id.* at 72.

Dr. Libby attributed many of the inconsistencies in Mihalacki's analysis to an insufficient quantity of DNA in the tested samples. Notably, Dr. Libby personally examined the slides of the tested genetic material, and he was unable to confirm the presence of any sperm. *Id.* at 79. Dr. Libby explained that, generally, accurate testing requires at least "a couple of hundred" sperm cells, but Pennsylvania State Police scientists reported that they identified possibly one sperm cell. *Id.* at 28, 80. Dr. Libby further noted that Mihalacki had conducted tests to quantify the amount of DNA available for analysis, and those "tests show that there [were] essentially undetectable, unquantifiable levels of DNA." *Id.* at 80. Dr. Libby opined that the testing of an insufficient quantity of DNA does not allow for a justifiable interpretation of the results, and "when you get results which are clearly inconclusive or absent, that tells you that the test results are probably not reliable due to the fact that . . . all the DNA is not represented at all the loci." *Id.* at 87-88. With regard to the population statistics that Mihalacki related to the jury, reflecting the astronomical odds against the sperm fraction coming from any individual other than Pruitt, Dr. Libby testified that he understood how

Mihalacki calculated those numbers, but opined that they were unreliable. Dr. Libby reasoned that "there are too many inconsistencies in the [sperm fraction] and too many possibilities for the results being not reproducible and not reliable. Too many instances in which there are no data whatsoever which could have resulted in exclusion . . . and too many instances of problems that I found through the data." *Id.* at 94.

By way of conclusion, Dr. Libby opined that, to a reasonable degree of scientific certainty, the data generated through Mihalacki's testing was unreliable, and that he would characterize the DNA analysis, overall, as "inconclusive." *Id.* at 95. Finally, Dr. Libby stated that he likely was available for consultation at the time of Pruitt's trial, and that any competent geneticist should have been able to provide a similar opinion. *Id.* at 95-96.

## II. Ineffectiveness of Trial Counsel

As the Majority notes, Pruitt's lead trial counsel conceded that he did not understand the data contained within Mihalacki's report, and that he actually and merely relied upon Mihalacki's assertions that the sperm fraction matched the known sample of Pruitt's DNA. *See* Maj. Op. at 6. Despite counsel's failure to appreciate the multiple, endemic deficiencies in Mihalacki's analysis, counsel did not consult with a single DNA expert. Absent a rudimentary understanding of the DNA analysis, counsel was unable to conduct an effective cross-examination. Even without a basic familiarity with STRs, allele pairings, and the like, counsel should have been able to recognize and to call attention to the disparity between Mihalacki's assertion at trial of a perfect genetic match and her previous reporting of inconclusive results at five loci. The Majority concludes that Pruitt's trial counsel failed to conduct a professionally reasonable investigation regarding the DNA evidence, and that no reasonable strategy may be discerned from counsel's failure to gain a better understanding of that evidence. *See* Maj. Op. at 7. I

agree. Counsel's inattention to the DNA evidence, and particularly the failure to highlight the potentially exculpatory results at locus FGA, is "simply inexplicable." *Id.* at 8.

Nonetheless, the Majority concludes that Pruitt's claim falls short of the standard for ineffectiveness of counsel because Pruitt cannot establish that he was prejudiced by his counsel's deficient performance.[4] The Majority acknowledges the uniquely powerful nature of DNA evidence in the eyes of a juror, and notes that, "were this a case in which identity was in controversy, we would likely find prejudice to be manifest." *Id.* This is not the case, the Majority holds, because Pruitt's "identity as the *robber and killer* has never seriously been put into contest, even at the post-conviction stage." *Id.* at 8-9 (emphasis added). For its finding that there was no reasonable probability that able representation would have affected the verdict, the Majority relies upon Pruitt's consistent admission that he perpetrated the violent attack upon Gougler, upon the fact that the physical evidence made it apparent that a rape occurred, and upon the fact that Pruitt "has never provided any plausible explanation that would persuasively suggest any other person's involvement in the relevant events that took place in the victim's house." *Id.* at 9.

The trial burden never was upon Pruitt, whether to provide a "plausible explanation" to suggest another individual's involvement in the crimes or otherwise.

---

[4] To establish ineffectiveness of counsel:

> [A] petitioner must demonstrate that: the underlying claim is of arguable merit; counsel had no reasonable basis for the act or omission in question; and he suffered prejudice as a result, *i.e.*, there is a reasonable probability that, but for counsel's error, the outcome of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding.

*Laird*, 119 A.3d at 978 (citations omitted).

The burden always was upon the Commonwealth to establish Pruitt's guilt beyond a reasonable doubt as to each crime charged.[5] Regardless, information was available to defense counsel that could have raised the possibility that a different individual committed the rape, especially in light of the inconsistencies in the DNA evidence. As the Majority notes, Pruitt gave a statement to police detailing his actions that resulted in Gougler's death. That statement was memorialized in writing and submitted to the jury at trial. Pruitt explained that the incident began when he and another man were smoking crack cocaine in an alley near Gougler's home, but ran out of crack and sought to find money to purchase more. Pruitt's statement began:

> I was getting high, I smoked a lot of bags of crack. Me and this guy was in the alleyway smoking and we just came from the 600 block of 9th street and bought 3 bags of crack from there. Me and the guy I was with were smoking it and we smoked it all and we were looking at each other and saying we want more. So we keep walking up the alley and I noticed the lady in the yard and I stopped and told the guys [sic] I was going to try and get some money and he said he was going to try to get some money. [T]hen he kept walking and I stopped and was watching the lady in the yard and waited for her to go towards her door, I pushed her inside and [I] went inside.

Statement, 10/2/2002, Commonwealth's Exhibit No. 61, at 1. Pruitt explained that he demanded money from Gougler and restrained her. He then tied her up with her

---

[5]     While Pruitt bears the post-conviction burden of establishing prejudice, *see* Maj. Op. at 7 n.6, 9 n.10, that burden does not require Pruitt to demonstrate that he could have persuaded the jury of his actual innocence of the sexual offenses. One need not prove *innocence* to obtain an acquittal—it is more than sufficient to show that the Commonwealth has not met its burden to prove *guilt* beyond a reasonable doubt. Here, we are evaluating the effect of counsel's dereliction, and Pruitt need only demonstrate that there is a reasonable probability that, but for the deficient advocacy, the outcome would have been different. The point here, as discussed *infra*, is that effective representation with regard to the DNA evidence would have called Pruitt's identity as the rapist into question, and would have cast doubt upon the Commonwealth's ability to meet its burden to prove Pruitt's guilt as to that charge. It does not translate into a requirement that Pruitt must have proven the opposite.

clothes and a telephone wire so that he could search for money upstairs. He stated that he tied a rag or towel around Gougler's mouth, and that he thought he punched her in the head. After he located some money in a room upstairs, he returned downstairs and discovered that Gougler was dead. He explained that he used the money to purchase more crack, smoked some of it, then returned to the scene, where he untied Gougler's body, began to clean up the scene, and apologized to Gougler's lifeless body. Pruitt then fled the scene.

Notably, Pruitt's confession involved no admission to rape or any kind of sexual offense. At the end of the statement, an investigator asked, "Did you rape the victim?" Pruitt replied, "No." *Id.* at 3. The Majority certainly is correct in noting that, following the introduction of this statement, Pruitt's identity as the robber and killer was not seriously in dispute. However, the statement does not establish Pruitt's identity as the rapist. Although Pruitt admitted both to the police and to other individuals that he committed the acts that constituted burglary, robbery, and murder, and although the fact that a sexual assault occurred was apparent from a medical examination of Gougler's body, Mihalacki's DNA analysis was the sole physical or forensic evidence that purported to connect Pruitt to the sexual offenses.

Had Pruitt's counsel put forth a professionally reasonable effort to undermine the Commonwealth's DNA evidence, Pruitt's identity as the rapist would have been in doubt. It was apparent from Pruitt's confession that he was in the company of another man with whom he was smoking crack immediately before the commission of the crimes. Had Pruitt's counsel demonstrated to the jury that the DNA evidence was too unreliable to inculpate Pruitt in the rape, or that it potentially exculpated him, it naturally would follow that the DNA may have come from another individual, perhaps the man who was with Pruitt just before Pruitt entered Gougler's home. Had counsel exposed

the weaknesses in the Commonwealth's DNA evidence and the obvious resultant inaccuracy of the asserted population statistics, and highlighted the fact that no other physical or forensic evidence suggested that Pruitt committed the sexual offenses, a significant doubt likely would have remained as to whether the Commonwealth met its burden of proving Pruitt's culpability for rape and IDSI.

Why did this matter? Both Pruitt's trial counsel and today's Majority appear to have ascribed relatively lesser significance to Pruitt's convictions for rape and IDSI, given the weight of the evidence suggesting Pruitt's culpability for murder. At the time of Pruitt's trial, counsel largely disregarded the DNA evidence in favor of focusing upon the elements of first-degree murder. During his closing argument, Pruitt's lead counsel stated expressly:

> Now, I'm also not here to tell you that Michael Pruitt's not responsible for all these horrible things you've heard. Michael Pruitt gave a statement to the police in which he admitted committing offenses. . . . And I'm also not here to talk about the other offenses. There's only one thing I want to talk about. And that is whether we have second degree murder or first degree murder.

N.T., 4/28/2005, at 631-32. Today's Majority concludes that diligent advocacy with regard to the DNA evidence would not have affected the verdict because, in part, it was clear that Pruitt was the robber and killer. *See* Maj. Op. at 8.

This misses the point. The sexual offenses, and the DNA evidence that purported to prove them, were of undeniable importance to the proceedings, and of particular significance in the penalty phase of the trial. Testifying in the post-conviction proceedings, one of Pruitt's attorneys described what he perceived to be the impact of the DNA evidence and the sexual offenses that it suggested:

> Q: How would you describe [the DNA] evidence in terms of impact on the jury? Do you have an impression?

A: Devastating.

Q: Devastating?

A: Yes.

Q: Why was it devastating?

A: I think it established for the jury beyond a reasonable doubt the charge of rape.

*　　*　　*

Q: Have you represented Defendants who have been charged with rape before?

A: Yes.

Q: Does that have any — in your experience, does that [play] any emotional role in the atmosphere of the case that there's a rape charge?

A: Yes.

Q: To the detriment of the client?

A: To the detriment of the client, yes.

N.T., PCRA Hearing, 8/22/2013, at 323-24.

The abhorrent nature of the sexual offenses in this case, and their impact upon the jurors, doubtlessly carried over into the penalty phase of the trial. The prosecutor capitalized upon those offenses in arguing for the existence of the statutory aggravating circumstance under 42 Pa.C.S. § 9711(d)(6), to wit, that the killing occurred while Pruitt was perpetrating a felony. In his closing argument during the penalty phase of the trial, the prosecutor mentioned Pruitt's culpability for rape or IDSI nine times. *See* N.T., 5/3/2005, at 156, 158, 165-66, 168. Unsurprisingly, given Pruitt's contemporaneous convictions for robbery, burglary, rape, and IDSI, the jury unanimously found the Subsection 9711(d)(6) aggravator beyond a reasonable doubt. However, the particular felony or felonies that the jury considered were not enumerated. The jury also found

one mitigating circumstance under the "catch-all" provision of 42 Pa.C.S. § 9711(e)(8), that Pruitt had a long history of cocaine use.

Assuredly, even if Pruitt's counsel had been effective in discrediting the Commonwealth's DNA evidence, and potentially obtaining acquittals on the rape and IDSI charges, the jury nonetheless could have found the Subsection 9711(d)(6) aggravator due to Pruitt's contemporaneous convictions for burglary and robbery. Were that the case, however, the jury may have placed lesser weight upon the sole aggravating circumstance. This Court has recognized that "the weighing process involves an assessment of the relative strength and weakness of the aggravating and mitigating evidence, which is necessarily a qualitative and not a quantitative approach, especially when the catchall mitigator is at issue." *Commonwealth v. Daniels*, 104 A.3d 267, 304 (Pa. 2014) (discussing *Commonwealth v. Tharp*, 101 A.3d 736 (Pa. 2014)). In the instant case, the jury weighed one aggravating circumstance against one "catch-all" mitigating circumstance. We cannot know whether, absent Pruitt's convictions for two heinous sexual offenses, and left with the less emotionally charged offenses of robbery and burglary, the jury's qualitative assessment of the relative strength of the aggravating and mitigating evidence would have led to the same outcome. Perhaps it would have. Perhaps not. The truth revealed about the DNA evidence undermines my confidence in the result.

Had Pruitt's trial counsel provided effective representation with regard to the DNA evidence, there is a reasonable probability that Pruitt's culpability for rape and IDSI would not have been taken for granted during the penalty phase. In turn, there is a reasonable probability that the jury's weighing of aggravating and mitigating circumstances would have produced a different result, *i.e.*, a sentence of life imprisonment rather than a sentence of death. Because this prospect is "sufficient to

undermine confidence" in the outcome of these proceedings, *Laird*, 119 A.3d at 978, I would hold that Pruitt is able to demonstrate prejudice, and that he thus has shown the ineffectiveness of his trial counsel. I would remand for further proceedings. I respectfully dissent.